In re Sidney Eugene ZAFFRON,
Debtor.

Warthog, Inc., Mairoll, Inc., Plaintiff,

v.

Sidney Eugene Zaffron, Defendant.

Bankruptcy No. 801–80757–478.
Adversary No. 801–8155–478.

United States Bankruptcy Court,
E.D. New York.

Jan. 12, 2004.

Borovina & Marullo, by Michael C. De-Lisa, Melville, NY, for Warthog, Inc., Mairoll, Inc.

Sidney Eugene Zaffron, Kismet and Glen Cove, NY, Debtor Pro Se.

## MEMORANDUM DECISION PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

DOROTHY EISENBERG, Bankruptcy Judge.

This matter is brought before the Court pursuant to an adversary proceeding filed by Warthog, Inc. and Mairoll, Inc. ("Plaintiff") against the Sidney Eugene Zaffron ("Debtor"), seeking to have certain debts against the Debtor deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Based on the facts of this case and applicable case law, the Court finds in favor of the Plaintiff. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bank. P. § 7052.

### FACTS

Some time in the 1980's, the Debtor was employed by West Point Pepperel, which became West Point Stevens ("West Point"). He was employed by West Point for approximately nineteen years as a salesperson, then as a merchandiser and a business manager. The Debtor admits to having no background in investment banking. The Debtor had been taking personal growth and development classes in Manhattan when he met an individual named Farzad Mirjani ("Mirjani"). Mr. Mirjani presented to the Debtor an idea he had regarding the development of a conference center for businesses to hold meetings and demonstrate products. The Debtor liked the idea, and over a time period of approximately eighteen months, the Debtor and Mirjani worked on a business proposal for such a conference center. The Debtor was aware that Mirjani's business experience was limited, and consisted of managing

new Taco Bell restaurants for that franchise.

The Debtor, Mirjani and Mirjani's father Bahman Mirjani formed Conference Center International ("CCI"). The Debtor testified that he and Mirjani's father each held approximately 25 shares in CCI.[1] Mirjani's father was Treasurer and Secretary, and the Debtor was the President. Mirjani was the Vice President of Operations.

In the late 1990's the Debtor and Mirjani began to look for spaces to lease in order to develop the conference center plan, and in 1998, the Debtor and Mirjani met with Peter Levine. Mr. Levine is a shopping center developer employed by Levcom Shopping Centers ("Levcom"), which was hired by the Fairchild Corporation to manage and lease a site located at the intersection of Route 110 and Conklin Street, Farmingdale, New York, and more commonly known as Airport Plaza ("Airport Plaza"). The Fairchild Corporation is the parent company of Mairoll, Inc. ("Mairoll"). Mairoll is the parent company of Warthog, Inc. ("Warthog" or the "Plaintiff"). Although Mairoll owned Airport Plaza during most of the time period relevant to this adversary proceeding, Mairoll transferred ownership of Airport Plaza and assigned all of its rights, obligations and claims to the property to Warthog in April 1999. Therefore, Warthog is the actual plaintiff in this action.

Airport Plaza was to be developed as a mixed-use destination center of approximately half a million square feet, comprised of retail stores, offices and entertainment venues. Levine, as agent for the owner, initially met with Mirjani, who represented to Levine that his company CCI was looking for 8,000 square feet of office space for the purpose of operating a con-

---

1. The Debtor never provided a sufficient explanation as to why Mirjani's father was is- sued shares in CCI instead of Mirjani.

ference center facility. Mirjani represented to Levine that he and the Debtor were looking to develop the conference center facility for businesses which would be used to demonstrate products such as computers and electronic equipment to vendors. According to Levine, Mirjani represented he was the "operations" man and the Debtor was the "finance" man. Mirjani further represented to Levine that the leasing of space at Airport Plaza as a conference center was part of a much larger conference center project that was contemplated by CCI to be based in New York City. At the first meeting, Mirjani presented Levine with a proposed business plan for CCI. Although the Debtor was not present at the first meeting with Levine, Mirjani represented that all matters had to be "okayed" by the Debtor, and Mirjani was to report back to the Debtor with regard to any developments regarding CCI.

After meeting with Levine, Mirjani requested additional space for CCI in the approximate amount of 20,000 sq. feet because the site at Airport Plaza was so impressive. Within two weeks of meeting with Mirjani, Levine met with the Debtor as well. Levine was interested in discussing the financial aspects of the conference center with the Debtor, who represented to Levine that he was currently negotiating with Fleet Bank and other investment groups to finance the project. Levine was advised by the Debtor that CCI had enough subscribers to generate the funding necessary to move forward with the larger space. In addition, several alleged prospective clients of CCI came to view the site at Airport Plaza prior to the entry of any contract between CCI and Mairoll.

At some point in time after the parties agreed to increase the lease space to 20,-000 sq. feet, Mirjani, while in the presence of the Debtor, represented to Levine that CCI had a commitment which was going to be finalized any day with Fleet Bank for $1.2 million in addition to the private investors. Purportedly, Mr. Levine was shown a letter on Fleet Bank letterhead which discussed the negotiations between Fleet Bank and CCI for the $1.2 million loan. However, such letter, if it existed, was not produced at trial. These representations, coupled with the representations from the Debtor and Mirjani of alleged commitments from several major businesses, including some Fortune 500 companies, to use the conference center facility to be leased by CCI, induced Levine as agent for the landlord to continue to deal with the Debtor and Mirjani to the exclusion of other prospective tenants. Although the Debtor states that he was not present with Levine and Mirjani when these representations such as the Fleet Bank financing were made prior to entry into the lease agreement, Levine disputes this and the Debtor acknowledges that he was present when Mirjani made such representations to Levine after the lease was entered into. The Debtor further acknowledges that he knew that CCI had not obtained a loan commitment from Fleet Bank, but he did not correct Mirjani in the presence of Levine. Instead, he voiced his complaints to Mirjani alone, after the meeting had taken place.

Commencing in January 1999, Mirjani met with the project architect, Levine and the project supervisor, as well as Frank Vero from the construction management company for Airport Plaza to design the space to be leased by CCI. According to Levine, the Debtor was present at the weekly meetings approximately 60% of the time. On several occasions, Levine asked for personal financial statements from the Debtor and the other business partners, but such financial statements were never provided to Levine.

At some point thereafter, Mirjani advised Levine that the Debtor and his partners were prepared to lease the entire 40,000, sq. foot space subject to completing a financial transaction with Marine Midland Bank instead of obtaining financing from Fleet Bank.[2] Following this decision, the Debtor and Mirjani continued to attend weekly construction meetings at Airport Plaza and began to develop the design of the space. As a result of the decision to lease 40,000 sq. feet of office space, certain construction alterations would be necessary and arrangements would have to be made to modify the space of certain first floor tenants to accommodate additional stairwells to service the conference center.

On March 11, 1999, a written agreement of lease was entered into between Mairoll, as landlord, and CCI, as tenant, for approximately 40,000 sq. feet at Airport Plaza (the "Lease"). The Debtor signed the lease on behalf of CCI. Warthog, as successor in interest to Mairoll, incurred the cost of the necessary construction changes in order to accommodate CCI. Pursuant to the Lease, Warthog agreed to pay $20.00 per square foot (or $800,000) towards construction work to be done on behalf of CCI within its leased space provided that union labor was used on the job. The Lease specifically limits the extent to which Warthog would be required to modify the premises by providing that "no such change shall cause the cost of Landlord's Work to exceed $20.00 per square foot."

Section 2.2 of the Lease further provides that CCI is to bear the cost of completing the finishing work on the premises, such as the utilities, detailed interior finish, building—front and mechanical and electrical specifications ("CCI Fit–Out Work"), and in the event that CCI fails to perform any of the finishing work or, if in Warthog's reasonable judgment, it is necessary for the coordinated opening of the shopping center, Warthog reserves the right to perform the CCI Fit–Out Work and CCI shall reimburse Warthog.

Section 3.2 of the Lease provides that beginning on the 150th day after Warthog has notified CCI that the premises are ready for CCI to commence the CCI Fit–Out Work, rent would be due on the first day of each calendar month thereafter. Sections 3.3 and 3.4 of the Lease provide that commencing on the 60th day after Warthog has delivered the premises so that CCI can commence the CCI Fit–Out Work and monthly thereafter, tax rent and common area rent would be due on the premises.

In addition to the Lease, the Debtor and Mirjani expressed an interest in leasing additional space directly below the proposed conference center to open up a restaurant to serve people attending conferences at the premises and for the general public. However, the Plaintiff had already committed to lease the space in question to Bellagio's Pizza and Grand China Restaurant. As a result of the Debtor's and Mirjani's interest in leasing space for a restaurant directly below the proposed conference center, these two proposed restaurants were moved from their original spaces to spaces in the back of the building. An entity known as Republic Restaurant International, Inc. ("RRI"), which stock was owned by the Debtor and Mirjani, entered into a lease dated August 10, 1999 with Warthog for 8,000 sq. feet directly below the space leased by CCI (the "Restaurant Lease"). The Debtor is listed as President of RRI on the Restaurant

**2.** The First Amendment to the Lease dated March 22, 1999, effective as of March 11, 1999, reflects that the lease space was increased from 20,000 sq. feet to 40,000 sq. feet. (Ex. 9).

Lease, and he is a signatory on the Restaurant Lease. RRI's obligations under the Restaurant Lease are guaranteed by CCI. The salient terms of the Restaurant Lease are substantially the same as the terms set forth in the Conference Center Lease. According to Levine, the Debtor represented that he was familiar with the restaurant industry, and that Mirjani had experience in the restaurant industry, operating several different restaurants at one time. Levine had requested information regarding Mirjani's experience with restaurants, and was met with repeated delays by Mirjani. It was not until after the Restaurant Lease was entered into that Levine discovered that Mirjani's restaurant experience was limited to some involvement with opening and managing new Taco Bell restaurants.

Contrary to the assertions made by Mirjani and the Debtor, at the time the Real Estate Lease was entered into, there was no financing in place with Fleet or Marine Midland, and the Debtor was not consulting with various investment groups which were eager to invest in CCI. In fact, after the Lease was entered into, in March or April 1999, CCI had only obtained a small business loan in the amount of approximately $260,000. CCI also had approximately $110,000 in cash from four or five investors, including the Debtor and Mr. Digregorio, who was retained as counsel to CCI. CCI had no other financial assets. With regard to Fleet Bank, CCI had not applied for a loan with Fleet Bank until sometime in the Spring of 1999. At the time that the Lease was entered into and thereafter, the amount of financing that CCI had in place was not even close to the amount required to finance the changes being made to the space at the request of CCI. Furthermore, the Debtor never corrected Mirjani's misrepresentations regarding CCI's attempts to obtain financing from Fleet Bank.

Although the Debtor made representations to Levine and others regarding booking of the conference center space by various entities, the Debtor failed to produce any evidence at trial that CCI had actually booked the leased premises for any events. The promise that clients were interested in booking the leased premises, coupled with the promise that financing was in place from either Fleet Bank or another lending institution as well as with private investment groups, provided the Plaintiff with sufficient inducement to enter into the Lease with CCI. Furthermore, the Plaintiff made substantial changes to the premises leased by CCI primarily at the request of CCI, which cost and expense was borne by the Plaintiff.

By the end of 1999, after the Plaintiff had made a majority of the alterations to the premises at the request of CCI, it was becoming clear that CCI did not have the financing it needed to continue the project. A meeting was scheduled with the Debtor, Mirjani, Levine and representatives from Fairchild for November or December of 1999. At the meeting, Levine and the representatives from Fairchild reiterated that they believed in the concept of the conference center, but they had lost faith in CCI's ability to obtain financing. CCI was given one last chance to come up with at least $1 million in financing, and representatives of Fairchild stated that Fairchild was willing to become a partner in the conference center by investing approximately $1.1 million. Fairchild's investment was conditioned on CCI obtaining the $1 million in financing within approximately the next thirty days.

At this point, the Debtor was ready to give up on the venture, but he felt that CCI was being given a great opportunity to develop the conference center which he could not pass up. The Debtor was sure

that Mirjani had made misrepresentations to Levine, Fairchild and the developers regarding the financing in order to induce them to enter into the Lease and the Restaurant Lease, but he did not state this to anyone at the meeting in November or December, 1999. Instead, he believed that he had some sort of unspoken understanding that at some point, Mirjani would be pushed out of the project, and the Debtor alone would be dealing with Levine. This belief was not based on anything specifically conveyed to any party, and certainly the Debtor did not ever clarify or reveal to Levine that Mirjani had made misrepresentations to Levine and other people involved in the project. Ultimately, CCI did not obtain the loan commitment which was necessary to fund the project, and in the early part of 2000, the Debtor and Mirjani parted ways. In September, 2000, CCI surrendered the premises for the conference center and the Restaurant.

Through August, 1999, Warthog, as successor in interest to Mairoll, paid the construction manager for Airport Plaza, the sum of $800,000 toward construction work performed on CCI's behalf pursuant to the Lease. Through November, 1999, Warthog paid an additional $743,267 for Fit-Out Work on CCI's space to accommodate requests made by CCI. Warthog also incurred $611,000 to remove mechanics' liens placed on the property leased by CCI and/or RRI which were obligations of CCI and/or RRI.

According to the documents provided by Warthog, CCI's rent obligations under the Lease commenced on March 1, 2000, and CCI's obligations to make payments attributable to taxes and common area charges commenced on December 1, 1999. The rental obligations ceased on February 28, 2002, when new tenants commenced making rent payments for the same space. Plaintiff's claims the total rent accrued and

not paid under the Lease is $2,025,006.43. The rental obligations under the Restaurant Lease commenced on June 1, 2000 and RRI's obligations to make payments attributable to taxes and common area charges commenced on May 1, 2000. The rental obligations ceased on February 28, 2000, but Warthog was able to lease the space out to LL Weans from July 9, 2001 through February 28, 2002, thereby reducing the total amount of rent obligations claimed from $562,170.74 to $487,762.49. (Ex. 2).

In addition to these items, Warthog claims to have expended $118,916.45 in legal fees in attempting to evict CCI and RRI from the premises, which fees were incurred from February, 2000 through October, 2000. However, the Lease and the Restaurant Lease provide in Section 9.3 that in the event the Plaintiff commences summary proceedings against CCI and RRI, they are only liable to the Plaintiff for only attorneys' fees incurred by the Plaintiff in reletting the premises. Therefore, this portion of the Plaintiff's claim would be limited to such legal fees incurred in connection with re-letting the premises formerly leased by CCI and RRI.

On February 2, 2001, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. The Plaintiff commenced this adversary proceeding on April 25, 2001 seeking to have the debts owed by the Debtor deemed nondischargeable. The Plaintiff filed an amended complaint on August 8, 2002 and the Debtor filed his answer on September 9, 2002. After certain motion practice, the trial was held on June 9, 2003.

DISCUSSION

The elements of a claim for fraudulent misrepresentation under section 523(a)(2)(A) of the Bankruptcy Code are: (1) misrepresentation of a fact by the

debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, and (7) that damage proximately resulted from the misrepresentation. *Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 530 (Bankr.E.D.N.Y.). (Other citations omitted). The standard of proof for exceptions to dischargeability under section 523 of the Bankruptcy Code is the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

■ Before making a determination on each of the elements listed above, the Court must decide whether it is appropriate to hold the Debtor individually liable for any actions he took on behalf of CCI, in which he was the President and 50% shareholder, and on behalf of RRI, in which he was the President and a shareholder of an undisclosed amount.[3] Courts have made it clear that " '[i]t is not necessary that the property or money obtained be procured for the Debtor himself. Thus, if an officer, director or shareholder of a corporation has obtained money or property for the corporation through fraud, he will not be shielded by the corporate form.' " *Southern Concrete Construction Co. v. Lennard (In re Lennard)*, 245 B.R. 428, 431 (Bankr.M.D.Ga.1999) (quoting *Weinreich v. Langworthy (In re Langworthy)*, 121 B.R. 903, 907 (Bankr.M.D.Fla. 1990), and *Bell v. Smith (In re Smith)*, 232 B.R. 461 (Bankr.D.Idaho 1998)). In this case, the fact that any actions taken by the Debtor were for the benefit of CCI and RRI, in which the Debtor had an interest, and not the Debtor directly, is not a bar to recovery under this section of the Bankruptcy Code.

The Court of Appeals for the Second Circuit has not ruled on this issue squarely, but other circuits provide guidance on this issue. Some courts have found that a debtor receives an indirect benefit where the debtor has an interest in the entity obtaining the direct benefit. This indirect benefit to the debtor is sufficient to make a finding of non-dischargeability under section 523(a)(2)(A) of the Bankruptcy Code. *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556 (6th Cir. 1992), *cert. denied*, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); and *Ashley v. Church (In re Ashley)*, 903 F.2d 599 (9th Cir.1990). The Court of Appeals for the Fifth Circuit takes the position there is no "receipt of benefit" requirement contained in § 523(a)(2)(A):

> The statute focuses on the character of the debt, not the culpability of the debtor or whether the debtor benefitted from the fraud. *See* Lawrence Ponoroff, *Vicarious Thrills: The Case for Application of Agency Rules in Bankruptcy Dischargeability Litigation*, 70 Tul. L.Rev. 2515, 2542 (1996) (arguing that § 523(a)(2) makes all debts that are the product of fraud nondischargeable). Thus, the plain meaning of the statute is that debtors cannot discharge any debts that arise from fraud so long as they are liable to the creditor for the fraud.

*Deodati v. M.M. Winkler & Assoc. (Matter of M.M. Winkler & Associates)*, 239 F.3d 746, 749 (5th Cir.2001).

The Fifth Circuit held that the benefit to a defendant is not a requirement to finding liability, particularly in an agency or partnership situation. *Id.* This holds true even where the defendant debtor is found to be innocent of committing fraud,

---

**3.** Given that the only two shareholders of RRI were the Debtor and Mirjani, the Court concludes that the Debtor is a significant shareholder of RRI.

and the fraud is imputed to the debtor. *Id.* Under either theory, the Debtor can be held liable under § 523(a)(2)(A) because he received an indirect benefit from the fraudulent acts. CCI and RRI obtained the benefit of the Lease and the Restaurant Lease, respectively, which required the Plaintiff to provide services in the form of substantial alterations to the Airport Plaza, at the Plaintiff's own cost and expense. The Debtor received an indirect benefit as he was a significant shareholder and an officer in both CCI and RRI. Therefore, any argument that this section of the Bankruptcy Code cannot apply to the Debtor is without merit.

■ Turning to the elements of § 523(a)(2)(A), Warthog must prove by a preponderance of the evidence that the Debtor made false statements with the intention of deceiving the Plaintiffs. According to the *Restatement (Second) of Torts,* § 525 (1976):

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

The term "actual fraud" is described as:

> any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.

*Wilcoxon Constr., Inc. v. Woodall (In re Woodall),* 177 B.R. 517, 519–520 (Bankr. D.Md.1995) (other citations omitted). The fraud must be the basis for the agreement to provide money, property or services to the defendant, and later misrepresentations are irrelevant to a determination un-

der this section of the Bankruptcy Code. *Id.* at 524.

The gravamen of the Plaintiff's amended complaint is that in order to induce the Plaintiffs to enter into the Lease and the Restaurant Lease and incur construction costs for the benefit of CCI, the Debtor, along with his partner or agent, Mirjani, made the following misrepresentations:

1) CCI had obtained a financing commitment from Fleet Bank;

2) CCI had groups of private investors willing to invest in the conference center;

3) CCI had commitments from certain Fortune 500 companies to use the space to be leased by CCI; and

4) the Debtor was an investment banker with experience in the restaurant business.

Certainly, any representation made by the Debtor regarding financing commitments or commitments to use the conference center would amount to fraud if the Debtor made such statements, knowing they were false, in order to induce the Plaintiffs to lease the space to CCI and RRI. However, the Debtor claims that he made no misrepresentations and his wrongdoing did not extend beyond his failure to correct Mirjani when, after the Lease was signed, Mirjani falsely represented that CCI had financing in place. The Debtor asserts that Mirjani made all of the false statements to Levine and the others, and he had no knowledge that prior to signing the Lease, Mirjani made multiple false representations regarding CCI's ability to obtain financing, or that Mirjani provided a letter to Levine ostensibly from Fleet Bank wherein Fleet acknowledged that it was providing financing to CCI. With regard to the clients committed to using the premises, the Debtor claims again that he made no false statements and that CCI did have actual commitments

from certain clients to use the space, but no evidence of such fact was produced. Finally, the Debtor alleges that he made no misrepresentations regarding obtaining financing from private investors, but rather that Levine and the others were kept abreast of the Debtor's attempts to obtain this financing.

Despite these factual disputes, it is clear to the Court that Mirjani made material false representations regarding commitments by Fleet and other financial institutions to provide financing to CCI and regarding the clients who had committed to book the premises for business functions. The Debtor admits that CCI did not even apply for financing from Fleet until after the terms of the Lease had been agreed to, and perhaps even after the Lease was entered into. Furthermore, all agree that Mirjani misrepresented his knowledge and experience concerning the management of upscale restaurants, all in order to influence the Plaintiff to lease space to CCI and undertake substantial construction changes to the premises for the benefit of CCI. Without such misrepresentations, it is apparent that the Plaintiff would not have entered into the Conference Lease or the Restaurant Lease and would not have incurred the costs and expense to model the premises on CCI' s specifications.

It is also undisputed that Mirjani held the position of Vice President of Operations of CCI, and that the Debtor knew that Mirjani was meeting with the Plaintiffs on a regular basis to review the design plans and specifications for the CCI's and RRI's premises at Airport Plaza. In addition, the Debtor knew or should have known by the increase in size of the total leased space from 8,000 sq. feet to 40,000 sq. feet, that significant financing would have to be in place to pay for the space and the changes necessary to accommodate CCI and RRI. The Debtor signed the Real Property Lease and the Restaurant Lease, and attended at least 60% of the weekly planning meetings, and permitted Mirjani to attend the other meetings alone, as a representative of CCI and RRI.

 Although the Debtor did not submit findings of fact and conclusions of law after the trial, the Debtor, who represented himself pro se, attempted at trial to distance himself from Mirjani and his actions, while portraying himself as an honest man who was duped by his business partner. However, the Debtor admits to being the "finance" man, and admits that Levine looked to the Debtor for reassurance that proper and adequate financing was in place prior to entering into the Lease and the Restaurant Lease. Even if the Court accepted the Debtor's representations that the Debtor did not participate in making the false statements, the law permits the actions of Mirjani to be attributed to the Debtor as his agent:

> 'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' *Pan American World Airways v. Shulman Transport Enterprises, Inc. (In re Shulman Transport Enterprises, Inc.),* 744 F.2d 293, 295 (2d Cir.1984) (quoting *Restatement (Second) of Agency* § 1(1) (1958)).... [U]nder general agency theory, a principal is bound by the acts of his or her agent if the principal consents to the act in advance or ratifies it after the fact. *See* Am.Jur.2d, Agency § 270 (1986).

*Pisano v. Verdon (In re Verdon),* 95 B.R. 877, 882–83 (other citations omitted).

Under the theory of agency, the fact that Mirjani held the title of Vice President of Operations of CCI cloaked him with the appearance of authority, upon which third parties had a right to rely.

According to *Restatement (Second) of Agency*, § 27, Comment (a):

> [A]pparent authority can be created by appointing a person to a position ... which carries with it generally recognized duties to those who know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position.

The Debtor knew that Mirjani was acting on behalf of CCI as Vice President of Operations, and there is no evidence that the Debtor limited Mirjani's ability to act on behalf of CCI or himself in any way. Even when the Debtor was aware that Mirjani was making false statements regarding CCI in its relationship to the Plaintiff, the Debtor did not correct him or attempt to rectify the representations. Therefore, the Court finds that an agency relationship existed between the Debtor and Mirjani for the purposes of this adversary proceeding.

Having made this finding, the Court is aware of a split of authority regarding whether the fraudulent intent of a debtor's agent may be imputed to the debtor without a further finding that the debtor knew or should have known of the fraud. The Court of Appeals for the Second Circuit has noted this conflict in case law, and has observed that the Third Circuit has observed in dicta that "common law principles of agency law would probably dictate the imputation of an agent's fraud to a[n innocent] principal under an analysis of § 523(a)(2)(B) of the Bankruptcy Code." *National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 302 (2nd Cir.1996) (other citations omitted). However, the Second Circuit has not ruled directly on whether it would side with the Third Circuit and other courts finding that the finding of an agency relationship alone would suffice to hold an innocent debtor responsible for the acts of his agent.

The Court of Appeals for the Eighth Circuit disagreed with the Third Circuit in *Walker v. Citizen's Bank of Maryville (In re Walker)*, 726 F.2d 452, 454 (8th Cir. 1984). In *Walker*, the Eighth Circuit considered whether an agency relationship alone would be sufficient to charge the agent's fraud to the principal. The court in *Walker* found that although actual participation in the fraud is not required, the principal either had to know or should have known of the agent's fraud for the agent's fraud to be imputed to the debtor-principal. Included as grounds for imputing the agent's fraud is where the debtor-principal is "recklessly indifferent" to the acts of the agent. *Id.* at 454. In making its determination, the Eighth Circuit cited to *In re Lovich*, 117 F.2d 612 (2d Cir.1941), in which the Court of Appeals for the Second Circuit found in an action to bar the debtor's discharge, an agent's fraud will be imputed to the principal only where the principal knew or should have known of the agent's fraud, or such knowledge will be inferred where the principal is recklessly indifferent to the agent's acts.

This Court finds that under either test, the Debtor is liable to the Plaintiff. In this case, Mirjani, committed actual fraud while acting in his scope of employment or apparent authority. The Debtor knew or should have known that Mirjani was making false representations in order to induce the Plaintiff to enter into the two leases. It is difficult to believe that based on the actual facts as the Debtor knew them to be, the Plaintiff would increase the square footage of the premises by 32,000 sq. feet and agree to lease to the Debtor and his partner a restaurant space for 8,000 feet without the representation of having significant financing. Furthermore, even after Mirjani made false representations to

Levine regarding the financing in the Debtor's presence, the Debtor did not advise the Plaintiff that the statements were incorrect. That equates to reckless indifference to the truth.

The Court further finds that the Plaintiffs' reliance on the representations of Mirjani and the Debtor was justified. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The falsity of the statements made by Mirjani and the Debtor were not readily apparent to Levine and the other parties representing the Plaintiff. Mr. Levine, who has had substantial experience in the area of commercial real estate rentals, was convinced by the constant misrepresentations made by the Debtor and Mirjani, including the purported letter from Fleet Bank, the various individuals coming by to view the space who claimed that they were interested in using the conference center, and in the belief that CCI had several private investors willing to loan funds to CCI.

The Plaintiff also suffered damages flowing from the misrepresentation, comprised of construction work performed pursuant to the Lease and the Restaurant Lease which the Plaintiff agreed to pay for, plus the costs incurred by the Plaintiff for the Fit–Out Work requested by CCI and RRI. In addition, the Plaintiff incurred lost rent damages as CCI and RRI made no rent payments to the Plaintiff. Furthermore, the Lease and the Restaurant Lease provide that CCI and RRI are responsible for legal fees incurred in connection with the re-letting of the premises formerly leased by CCI and RRI.

## CONCLUSION

1. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

2. The Plaintiff has established by a preponderance of evidence that it was fraudulently induced by the Debtor and Farzad Mirjani to enter into the Lease with CCI and the Restaurant Lease with RRI and to make substantial alterations to each of the premises. Although Mirjani made a majority of the false representations, the Debtor knew that Mirjani was acting on behalf of CCI and RRI. The Debtor either knew or should have known that Mirjani was making false representations to the Plaintiff, and therefore, Mirjani's representations are imputed to the Debtor.

3. The debt owed by CCI and RRI to the Plaintiff is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

4. Pursuant to the Lease and the Restaurant Lease, the Plaintiff was to incur certain expenses pursuant to the requirements of CCI and RRI, respectively. Such alterations caused the Plaintiff to incur costs in the amount of $2,154,267. The Defendant is also responsible for the unpaid rent owed by CCI and RRI in the aggregate amount of $2,512,768.92. Finally, the Defendant is liable to the Plaintiff for the legal fees incurred in reletting the premises, pursuant to Section 9.3 of the Lease and the Restaurant Lease.

Settle an Order in accordance with this decision.